Filed 6/13/13  P. v. Gutierrez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MARIO GUTIERREZ,<br><br>     Defendant and Appellant. | B241024<br><br>(Los Angeles County<br>Super. Ct. No. VA121790) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Lori Ann Fournier, Judge.  Affirmed.

        Lisa Holder, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Paul M. Roadarmel, Jr., Deputy Attorney General, for Plaintiff and Respondent.

_____

Appellant Mario Gutierrez appeals from the judgment entered following his conviction on two counts of attempted criminal threats (Pen. Code,[1] §§ 664, 422). Gutierrez argues the trial court erred in admitting evidence of his membership in a gang and his alleged attempts to intimidate the complaining witnesses. Gutierrez also asserts the evidence was insufficient to support each of his convictions because the prosecution failed to prove he had a specific intent to communicate a criminal threat. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Charges

The Los Angeles County District Attorney filed a two-count information charging Gutierrez in count one with making criminal threats against Emmanuel Gutierrez, and in count two with making criminal threats against Angelica Brito (§ 422). As to each count, it was alleged that Gutierrez had suffered one prior serious or violent felony conviction within the meaning of section 667, subdivision (a)(1) and the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Gutierrez pleaded not guilty to each count and denied the enhancement allegations.

### II.     The Evidence At Trial

On September 24, 2011, at about 6:15 p.m., Gutierrez and his brother, Emmanuel,[2] were arguing in the living room of their residence in Huntington Park. Earlier that evening, Gutierrez and Emmanuel had consumed a few beers. Emmanuel's girlfriend, Angelica Brito, and their three-year-old daughter also resided in the home. The daughter was not at home at the time; Brito was in her bedroom and went downstairs to see what was happening. Emmanuel was upset because he had seen one of Gutierrez's friends leaving the house. Emmanuel told Gutierrez that he did not want Gutierrez bringing his friends to the house because they were drug users.

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

[2]     For clarity and convenience, and not out of disrespect, we refer to Emmanuel Gutierrez by his first name.

Gutierrez and Emmanuel went outside followed by Brito. As the two men continued to argue, Gutierrez became increasingly angry and aggressive toward Emmanuel. Gutierrez told Emmanuel, "I'm going to kill you. I'm going to chop your legs off." Gutierrez then began walking around in circles. He also started punching Emmanuel's car window and kicking his car door. As Emmanuel and Brito stood on the front porch, Gutierrez walked in front of Brito, looked directly at her, and said, "I'm going to kill your daughter."

Upon hearing Gutierrez's statement about her daughter, Brito became concerned because he had "never said anything like that" before and she "wasn't sure what he's capable of doing." Brito felt that she had to call the police at that time because Gutierrez's statement caused her to fear for her family's safety. She also was concerned the argument between Gutierrez and Emmanuel might escalate into a physical altercation. Brito was nervously dialing 911 when Emmanuel took the phone from her and reported Gutierrez's threat to the 911 operator. Emmanuel decided to involve the police because he was fed up with Gutierrez and was also concerned there might be a physical confrontation. Gutierrez had been arrested for hitting Emmanuel in the past.

Huntington Park Police Department Sergeant Eric Ault was the first officer to arrive on the scene. When Sergeant Ault approached Gutierrez in the driveway and asked "what was going on," Gutierrez immediately answered, "If my brother tells you that I threatened to kill him, I didn't do that." Huntington Park Police Officer Saul Duran arrived as Gutierrez was being detained in the driveway. While at the scene, Officer Duran spoke with Emmanuel and Brito, both of whom appeared to be angry and upset. They reported to Officer Duran that Gutierrez had threatened to kill Emmanuel and their daughter. They also told Officer Duran that they were in fear for their own safety and the safety of their daughter due to Gutierrez's violent history.

Neither Sergeant Ault nor Officer Duran observed any objective signs that Gutierrez was under the influence of alcohol or drugs. His breath did not smell of alcohol, his eyes were not watery or bloodshot, and he did not have an unusual gait. Gutierrez was fairly talkative, but appeared to be coherent and responded logically to

3

the officers' questions. Sergeant Ault spent 10 to 12 minutes with Gutierrez at the scene. Officer Duran observed Gutierrez at the police station for approximately 15 minutes one-half hour to an hour after his arrest. At that time, Gutierrez was calm, quiet, and did not appear to be intoxicated. After being advised of his *Miranda* rights, Gutierrez told Officer Duran that he did not want to talk and simply wanted a court date.

While Gutierrez was in custody, he called the family's home and spoke with Brito. During the call, he told Brito that "he would see [her] soon." When Brito asked Gutierrez what he meant by that statement and whether he would be released soon, he did not answer her. Instead, he kept repeating, "I'll see you soon." Brito was concerned about Gutierrez's intent in making the statement and discussed the call with Emmanuel.

On November 9, 2011, a few weeks after Gutierrez's arrest, Probation Officer Gilbert Garay spoke with Emmanuel on the telephone in the course of preparing a pre-plea report. Emmanuel told Officer Garay that Gutierrez had been involved with gangs all of his life and had been in and out of jail. He said that his family had tried to help Gutierrez, but Gutierrez continued to bring drug users to their home and was causing a serious problem. In addition, Emmanuel stated that, since Gutierrez's arrest, several people had come on to the family's property and attempted to get into their cars, which had never before happened in the 11 years they had been at that residence. Emmanuel told Officer Garay that he believed Gutierrez was sending these individuals to their home through his contacts in jail because he was a gang member. Emmanuel also described Gutierrez's statement to Brito that he would see her soon and told Officer Garay that he took that statement as a threat.

At trial, both Emmanuel and Brito testified that Gutierrez was a drug user and that they believed he was under the influence of drugs at the time he threatened Emmanuel and their daughter. Emmanuel explained that he had lived with Gutierrez for over 20 years and knew how he acted when he was under the influence of drugs. According to Emmanuel, when Gutierrez was on drugs, he tended to act erratically and speak nonsensically. Although Brito had not observed Gutierrez taking drugs, she had found his pipes and other drug paraphernalia in the past. As described by Brito, Gutierrez was a

different person when he was on drugs. His facial expression would change, his eyes would become red, and his fingers would start to twitch. He also tended to stutter and become very aggressive. Neither Emmanuel nor Brito had ever observed Gutierrez being violent or aggressive when he was sober.

On the night of the incident, Brito noticed that Gutierrez was stuttering slightly and repeating the same statements. She also saw that his eyes were red and his fingers were twitching. Brito testified that she wanted Gutierrez to be prosecuted and to remain in custody because "he really needs help with his addiction, and that way I won't have to deal with him or see him." Emmanuel testified that he wanted Gutierrez to get help for his drug problem, but "not to go to jail for something he hasn't done or is not capable of doing."

### III.    Jury Verdict and Sentencing

The jury found Gutierrez not guilty of the charged offenses of making criminal threats, but guilty of the lesser included offenses of attempted criminal threats. In a bifurcated proceeding, the trial court found the allegations that Gutierrez had suffered one prior serious or violent felony conviction to be true. Gutierrez was sentenced to a total state prison term of seven years and eight months. He filed a timely notice of appeal.

### DISCUSSION

### I.    Rulings on the Admission of Evidence

On appeal, Gutierrez raises two arguments regarding the admission of evidence. First, he contends the trial court erred in admitting evidence of his membership in a gang because such evidence was inflammatory and overly prejudicial in the absence of any gang enhancement allegation or proof the charged crimes were gang-related. Second, he claims the trial court erred in admitting evidence of his alleged attempts to intimidate Emmanuel and Brito from jail because such evidence was speculative, irrelevant, and unduly prejudicial. Gutierrez also asserts that the errors had the effect of depriving him

5

of his constitutional right to due process. We conclude that the trial court did not abuse its discretion or violate due process in admitting the challenged evidence.

### A. Standard of Review

A trial court generally has broad discretion concerning the admission of evidence. (*People v. Cole* (2004) 33 Cal.4th 1158, 1197; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) When an objection under Evidence Code section 352 is raised, "the trial court 'must weigh the admission of [the challenged] evidence carefully in terms of whether the probative value of the evidence is greater than the potentially prejudicial effect its admission would have on the defense.'" (*People v. Cardenas* (1982) 31 Cal.3d 897, 904.) Evidence is overly prejudicial if it "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134.)

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question. . . .' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

As a general matter, application of the ordinary rules of evidence does not impermissibly infringe on a defendant's constitutional rights. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.) "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that

6

the jury must have used the evidence for an improper purpose.' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) Accordingly, "[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.)

### B. Admission of the Gang Evidence

#### 1. Relevant Facts

At trial, defense counsel objected to the introduction of any evidence regarding Gutierrez's gang affiliation. Defense counsel argued that such evidence was irrelevant because the case arose out of a domestic dispute and no gang enhancement allegation had been alleged. Defense counsel further asserted that the victims' vague belief that Gutierrez associated with gang members did not provide an adequate foundation for such evidence. The prosecutor countered that the evidence was relevant to Emmanuel's fear that Gutierrez was continuing to harass him from jail through his gang contacts. The prosecutor also explained that Emmanuel and Brito recently had become reluctant to cooperate, but previously had indicated that they knew of Gutierrez's gang involvement based on their familial relationships with him.

The trial court ruled as follows: "I am going to allow the witnesses to be questioned about the sustained fear aspect and element of the crime. And if they believed Mr. Gutierrez to be a gang member, then that goes to the sustained fear. Whether or not he actually is is a different issue. But . . . it's the victims' state of mind as to why they were afraid of him. So . . . in terms of whether he is a gang member or not, that goes to the weight of the evidence." The trial court also held that the evidence was probative on the issue of witness bias and recanting of prior testimony.

Officer Garay testified at trial about Emmanuel's statements to him that Gutierrez had been involved with gangs all of his life and may have been sending people to the family's home to intimidate them through his contacts with the gang. During her testimony, Brito was asked by the prosecutor if she knew whether Gutierrez was a gang member and if she was afraid of Gutierrez because of his gang affiliation. Brito testified

7

that she was aware Gutierrez was a member of the Lynwood Rude Boys with the moniker "Lefty." She denied that Gutierrez's gang affiliation caused her any fear or affected her testimony in any way. During his testimony, Emmanuel was asked about his statements to the probation officer concerning Gutierrez's gang involvement and suspected use of gang contacts to intimidate Emmanuel from jail. Emmanuel was also asked whether he feared Gutierrez because of his gang affiliation. Emmanuel testified that he did not recall making any statements about Gutierrez's membership in a gang to the probation officer. He also stated that it "was just a thought" that Gutierrez might be sending people to the house through gang contacts, but denied it caused him any fear. On cross-examination, Emmanuel testified that Gutierrez had not been involved in gangs for a very long time.

Following the witnesses' testimony, the trial court issued the following limiting instruction to the jury: "[A]ny testimony that you heard about whether or not Mr. Gutierrez was a member of a gang, anything about a gang, anything about people coming by the house, the only reason you heard that testimony was for a limited purpose. It goes to whether or not these witnesses who testified were fearful because of their thoughts. There is no evidence that Mr. Gutierrez is a gang member. That's not for you to decide or whether or not people came to the house because of him; it's just what the people believed and how that affected them. And it will be evidence you can consider for that purpose. . . ."

### 2.    Relevant Law

In cases not involving a section 186.22 gang enhancement allegation, it generally has been held that "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Gang evidence is not admissible where its sole relevance is to show that a defendant has a criminal disposition or bad character. (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 223; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) On the other hand, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation – including evidence

8

of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez*, *supra*, at p. 1049.) Gang evidence is therefore admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Albarran*, *supra*, at p. 223; *People v. Avitia*, *supra*, at p. 192.)

### 3.    The Gang Evidence Was Properly Admitted

In this case, the trial court did not abuse its discretion in admitting the evidence of Gutierrez's gang affiliation. To prove Gutierrez was guilty of making criminal threats, the prosecution had to establish, among other elements, that Gutierrez's threats caused Emmanuel and Brito to be in actual and reasonable sustained fear for their own safety or the safety of their family. (§ 422; *In re George T.* (2004) 33 Cal.4th 620, 630.) In the context of section 422, "sustained fear" means a fear that continues for "a period of time that extends beyond what is momentary, fleeting, or transitory. . . .The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear. [Citation.]" (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Here, the evidence pertaining to Gutierrez's gang affiliation was probative of whether the victims were in actual and reasonable sustained fear of Gutierrez based on his threats, and whether any fear experienced by the victims affected their testimony at trial. As discussed, Officer Garay testified that, when he spoke to Emmanuel a few weeks after the incident, Emmanuel stated that he believed Gutierrez, a life-long gang member, was sending people to the family's home through his contacts with his gang. Officer Garay further testified that Emmanuel appeared to be in fear for his safety at the time he reported these concerns. The evidence was thus relevant to establishing that Emmanuel's fear of Gutierrez was not momentary, fleeting, or transitory. The evidence was also relevant to countering Emmanuel's testimony that he was never afraid for his or

9

his family's safety based on Gutierrez's threats, and was merely concerned about an imminent physical altercation with Gutierrez when he contacted the police.

Gutierrez contends that the gang evidence could not have been probative on the element of sustained fear because both Emmanuel and Brito testified at trial that they did not believe Gutierrez would carry out his threats to kill Emmanuel and their daughter, and were not afraid of Gutierrez based on his gang affiliation. However, in speaking with Officer Garay, Emmanuel specifically mentioned Gutierrez's life-long gang involvement and his concern that Gutierrez might be using his gang contacts to intimidate Emmanuel from jail. Additionally, there was evidence that, immediately after the incident, both Emmanuel and Brito told Officer Duran that they were in fear for their own safety and the safety of their daughter due to Gutierrez's violent history. Given the victims' prior inconsistent statements to law enforcement about their state of mind, the evidence of Gutierrez's gang affiliation was relevant to demonstrating that his threats caused them to be in a state of reasonable sustained fear despite their subsequent testimony to the contrary. The gang evidence was also relevant to evaluating the credibility of the victims' testimony and explaining their reluctance to testify against Gutierrez at trial.

Furthermore, admission of the gang evidence was neither unduly prejudicial nor did it render the trial fundamentally unfair. The prosecutor's questions about Gutierrez's gang affiliation were narrow in scope, neutrally-phrased, and directed at establishing the foundation for the victims' knowledge about whether Gutierrez was a gang member and the extent to which such knowledge caused them fear. The prosecutor only addressed Gutierrez's gang affiliation in rebuttal after the issue was raised by defense counsel. Additionally, the trial court instructed the jury to consider the gang evidence only for the limited purpose of evaluating the victims' state of mind, and reminded the jury of its limiting instruction during closing arguments. We must presume that the jury understood and followed this instruction. (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 26; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) The fact that the jury acquitted Gutierrez of the charged offenses of making criminal threats, and instead convicted him

10

of the lesser included offenses of attempted criminal threats, further suggests that the gang evidence did not have an inflammatory impact on the verdict.

The trial court acted within its discretion and in accordance with due process in concluding that the probative value of the gang evidence outweighed the potential for undue prejudice.

### C. Admission of the Witness Intimidation Evidence

#### 1. Relevant Facts

At trial, defense counsel also objected to the introduction of evidence concerning the alleged attempts to intimidate Emmanuel and Brito while Gutierrez was in custody. Defense counsel argued that such evidence was impermissibly speculative because Emmanuel had no basis for knowing that the individuals he had observed outside his home had been sent by Gutierrez. Defense counsel further asserted that any fear the victims may have felt based on such conduct was not probative of whether Gutierrez's charged threats caused them fear. The prosecutor responded that he did not intend to use the evidence to prove that Gutierrez had, in fact, sent people to intimidate the victims, but rather to show that Emmanuel remained in a state of fear even after Gutierrez was in custody. The prosecutor also opined that Gutierrez's statement to Brito that he would see her soon was relevant to Emmanuel's demeanor on the witness stand and his reluctance to testify against Gutierrez due to fear for his family's safety.

The trial court overruled defense counsel's objection and held as follows: "I think the cases are clear that those inquiries are appropriate in terms of recanting witnesses or witnesses who may have initially testified. So I am going to allow [the prosecutor] to inquire of the witness, and whether or not he can prove up the statements is another issue." As discussed, the trial court also issued a limiting instruction to the jury that it was not allowed "to decide whether people came to the house because of [Gutierrez]," and that such evidence was to be considered solely for the purpose of determining "what the [witnesses] believed and how that affected them."

11

Brito testified at trial about Gutierrez's repeated statement to her on the telephone that he would see her soon. She related that she did not necessarily regard the statement as a threat, but she was "a little" concerned because she did not know what Gutierrez meant by it and whether he was upset that she and Emmanuel had contacted the police. Brito also testified that, on another occasion while Gutierrez was in custody, an unidentified person broke into her car as it was parked in the driveway. Brito stated that she did not know if Gutierrez had sent anyone to the family's home, but she was not fearful that he had done so. In his testimony, Emmanuel admitted that he told the probation officer about Gutierrez's statement to Brito that he would see her soon, but denied telling the officer that he perceived it as a threat. Emmanuel also confirmed that he told the probation officer about people coming onto the family's property and trying to break into their cars, but denied telling him that he believed those people had been sent by Gutierrez.

### 2. Relevant Law

Evidence of a third party's attempt to intimidate a witness generally is inadmissible to prove a defendant's consciousness of guilt unless the defendant authorized the intimidation. (*People v. Abel* (2012) 53 Cal.4th 891, 924; *People v. Williams* (1997) 16 Cal.4th 153, 200). However, "'[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.) "For such evidence to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1142, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *People v. Mendoza*, *supra*, at p. 1084 ["evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to

the defendant"].) "It is not necessarily the source of the threat -- but its existence -- that is relevant to the witness's credibility." (*People v. Burgener* (2003) 29 Cal.4th 833, 870.)

### 3.     The Witness Intimidation Evidence Was Properly Admitted

Here, the trial court acted within its discretion in admitting the evidence of the threats allegedly directed at the victims following Gutierrez's arrest. The credibility of Emmanuel and Brito, their general reluctance to testify against Gutierrez, and the extent to which their testimony may have been influenced by a fear of retaliation were critical issues in the case. While both Emmanuel and Brito informed Officer Duran immediately after the incident that they were in fear for their own safety and the safety of their daughter based on Gutierrez's threats, they told a different story at trial. Although Brito testified at one point that she called the police because Gutierrez's threats caused her to fear for her family's safety, she later stated that she was never afraid that Gutierrez would carry out his threats and was merely concerned that the verbal argument between Gutierrez and Emmanuel might escalate into a physical altercation. Emmanuel completely denied at trial that he was ever in fear for his or his family's safety due to Gutierrez's threats, and claimed that he knew Gutierrez was not capable of carrying them out. Emmanuel further testified that he called the police solely because he was fed up with Gutierrez's drug habit and wanted to avoid a physical confrontation. Evidence that Brito and Emmanuel felt they were being threatened after they reported Gutierrez's crimes to the police was thus highly relevant to evaluating their credibility at trial.

Gutierrez asserts that the evidence of his statement to Brito that he would see her soon should have been excluded because Brito and Emmanuel could only speculate that the statement was intended to be a threat. However, the probative value of the statement did not depend on Gutierrez's intent in making it, but on the victims' perception of the statement as a threat and the impact such perception may have had on their testimony. While not necessarily regarding it as a threat, Brito testified that the statement caused her concern about whether Gutierrez was angry that she and Emmanuel had contacted the police and whether Gutierrez might soon be released from custody. Although Emmanuel

testified that he did not view the statement as a threat because he did not hear it firsthand from Gutierrez, Officer Garay recalled that Emmanuel specifically told him that he did consider the statement to be a threat. Given the victims' reluctance to testify against Gutierrez at trial, the probative value of Gutierrez's repeated statement to Brito that he would see her soon substantially outweighed the potential for prejudice.

For similar reasons, the evidence relating to the victims' concern about unidentified individuals trespassing onto their property and trying to break into their cars was also admissible. Contrary to Gutierrez's claim, the evidence was not impermissibly speculative simply because the victims admitted they did not know whether Gutierrez had sent those individuals to their home. Irrespective of whether the alleged trespassers could be directly linked to Gutierrez, the evidence was relevant to establishing that Emmanuel and Brito remained fearful of Gutierrez several weeks after he had been taken into custody. Although both victims denied at trial that the presence of these strangers on their property caused them any fear, Officer Garay testified that Emmanuel did appear to be afraid for his family's safety when he reported these suspicious activities to him. Moreover, any potential for prejudice was mitigated by the trial court's limiting instruction to the jury that it was not to decide whether Gutierrez actually directed anyone to the victims' home but was to consider such evidence for the sole purpose of evaluating the victims' state of mind. In sum, because the substantial probative value of the witness intimidation evidence outweighed any potentially prejudicial effect, the trial court did not abuse its discretion or violate due process in admitting the challenged evidence.

## II.     Sufficiency of the Evidence Supporting the Convictions

Gutierrez also challenges the sufficiency of the evidence supporting his conviction. He specifically contends the evidence was insufficient to support a finding that he intended his statements to be taken as a true threat. Gutierrez claims the only reasonable inference that could be drawn from the evidence was that his statements were the result of an emotional outburst brought on by intoxication. We disagree.

14

In assessing a claim of insufficient evidence, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict – i.e., evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] . . . [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

To prove that a defendant made a criminal threat in violation of section 422, "the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat -- which may be 'made verbally, in writing, or by means of an electronic communication device' -- was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

15

"[I]f a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*People v. Toledo*, *supra*, 26 Cal.4th at p. 231.) In the context of section 422, "[a] threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.) Section 422 also "does not require an intent to actually carry out the threatened crime. [Citation.] Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety of his or her immediate family. [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.) "'[T]he determination whether a defendant intended his words to be taken as a threat . . . can be based on all the surrounding circumstances and not just on the words alone.'" (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431.)

In this case, there was sufficient evidence to support a finding that Gutierrez intended his statements to be taken as a threat. "Evidence of intoxication, while legally *relevant*, may be factually unconvincing. '[A]s with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) Although Emmanuel and Brito both testified that they believed Gutierrez was under the influence of alcohol or drugs at the time he made the threats, neither of the officers who questioned Gutierrez that night observed any objective symptoms of intoxication. As described by the officers, Gutierrez appeared to be in full command of his faculties. He did not have watery or bloodshot eyes or an unsteady gait. He also answered the officers' questions in a clear and coherent manner. Office Duran, who spoke with Gutierrez at the police station less than an hour after the incident, noted that Gutierrez was calm and quiet. Upon being

16

advised of his *Miranda* rights, Gutierrez unequivocally chose to exercise those rights and told Officer Duran that he wanted a court date. From this record, the jury reasonably could have found that to the extent Gutierrez consumed any alcohol or drugs that evening, he was not so intoxicated that he was unable to form the requisite intent.

The circumstances surrounding Gutierrez's statements further supported a finding that he intended to communicate an actual threat. The words he used were specific and unambiguous. Gutierrez did not merely allude to an act of violence, but unequivocally stated that he was going to kill Emmanuel and chop off his legs. After kicking and punching Emmanuel's car until he bled, Gutierrez then turned to Brito and told her that he was going to kill her daughter. At that point, both Brito and Emmanuel felt compelled to call the police. As Emmanuel was reporting the threat to the 911 operator, Gutierrez could be heard in the background repeating his statement that he was going to kill Emmanuel. When officers arrived on the scene shortly thereafter, Gutierrez told them without prompting, "If my brother tells you that I threatened to kill him, I didn't do that." Considering the totality of the evidence presented, each of Gutierrez's convictions for attempted criminal threats was supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.                    WOODS, J.

17